UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────────────X

UNITED STATES OF AMERICA,

    -against-                                       19 Cr. 116 (KMW)

RAYMOND RESTO,

                    Defendant.
──────────────────────────────────────X

## SENTENCING MEMORANDUM ON BEHALF OF
## THE DEFENDANT RAYMOND RESTO

                                                James E. Neuman, P.C.
                                                Attorney for Defendant
                                                100 Lafayette Street
                                                Suite 501
                                                New York, NY 10013
                                                (212) 966-5612

**Preliminary Statement**

This memorandum is submitted on behalf of Raymond Resto, whose sentencing is currently scheduled for February 16, 2022. Attached as Exhibit "A" is a letter from Mr. Resto. Attached as Exhibit "B" are letters of support from Mr. Resto's friends and family. Attached as Exhibit "C" are various certificates and records from the Bureau of Prison. Attached as Exhibit "D" are excerpts of medical and educational records. On January 26, 2021, Mr. Resto pleaded guilty to conspiring to distribute quantities of heroin and cocaine in violation of 21 U.S.C. § 841(b)(1)(C). The parties stipulated that the applicable guideline range was 121 to 151 months of imprisonment. In view of Mr. Resto's background and all of the circumstances of this crime, we urge this Court to impose a sentence substantially below the guideline range.

**Personal background**

Mr. Resto, now 48 years old, was born in the Bronx and raised in Manhattan. When he was a child, his parents separated because his father was abusive. Thereafter, Mr. Resto had virtually no contact with his father. He saw his father only once before he was murdered in 1985, when Mr. Resto was eleven years old. Although they did not have a significant relationship, the death affected Mr. Resto profoundly as it deprived him of the hope that he would ever enjoy the benefit of a paternal influence. Exhibit A.

Without any contributions from his father, his mother supported Mr. Resto and his siblings by working at two jobs, leaving his grandmother as the primary caregiver. Despite his mother's best efforts, the family was poor. They were often behind in their rent and had little food. Mr. Resto was forced to wear the same worn clothing, including sneakers with holes. PSR ¶¶ 88, 94. And he was

exposed to crime from the outset. The neighborhood was reportedly "plagued with drugs, violence, prostitution, and gambling." PSR ¶ 94.

But Mr. Resto was an excellent athlete growing up. He excelled at basketball and even taught his younger siblings and relatives how to play. Moreover, while he just in middle school he became known as someone would protect and motivate others. Exhibit B (letters from Diana Cruz, Brandee Cruz and Desiree Vasquez). When he was 13 years old, he received an athletic scholarship to attend La Salle Academy. But he felt out of place at the new school. Surrounded by kids with pricey clothing, Mr. Resto was self-conscious about being poor. PSR ¶ 95. At the age of 14 years old, he started smoking copious amounts of marijuana daily. When he was 15 years old, he began drinking alcohol every day. Both of these habit would continue for decades and substantially impede his prospects. PSR ¶¶ 111, 113.

Dissatisfied with his economic condition, he dropped out of high school in his sophomore year so that he could sell drugs. PSR ¶¶ 95, 118. Soon afterwards, Mr. Resto was arrested for the first time, charged with robbery. The arrest led to a plea in 1992 – when he was 16 years old – to attempted robbery in the second degree. He was adjudicated a youthful offender and sentenced to five years of probation. PSR ¶ 66. But he also displayed admirable qualities as a young adult. He worked sporadically as a construction worker. PSR ¶ 122. He fathered two children with Enid Aquino. PSR ¶ 102. He also used some of the proceeds of his drug dealing for good purposes. Among other things, he sponsored various youth sports leagues, coached teams, and gained a reputation as a generous, kind person who genuinely cared about children and "performed commendable community service." PSR ¶ 96. Exhibit B (letters from Cesar Rosa, Desiree Vasquez and Brandee Cruz).

On March 17, 1999, however, Mr. Resto was arrested on federal charges of distributing drugs. PSR ¶ 70. He ultimately pleaded guilty and was sentenced on February 3, 2000, to a term of 135 months of imprisonment, followed by five years of supervised release. PSR ¶ 69. While that matter was pending, Mr. Resto was also indicted on related charges of using firearms during a crime of violence. For that offense, Mr. Resto was sentenced on August 9, 2001, to 60 months of incarceration, to run consecutively with the sentence on the drug conspiracy charges. PSR ¶¶ 73-74.

Mr. Resto's experience in prison included both positive and negative events. He earned a GED and completed numerous educational programs and courses, such as "health journal," "aerobics for today," "living free," "business development," "beginners spinning" and "pre-employment skills." PSR ¶ 72. He also learned to be a trainer and provided fitness instruction to other inmates. PSR ¶ 121. But he was sanctioned a number of times for certain disciplinary violations. PSR ¶ 71. And while placed for an extended period in the Special Housing Unit as a sanction, the isolation led him to have suicidal thoughts occasionally. PSR ¶ 109.

After Mr. Resto was released from prison in June of 2013, he completed a six-month drug treatment program at Daytop Village. PSR ¶ 114. During this period, he began a long-term relationship with Taisha Santiago while residing with and caring for his mother, who was then recovering from cancer. PSR ¶¶ 98, 103. Later in 2013 and early 2014, the Probation Department accused him of violating his supervised release in various ways. PSR ¶ 75. Although Mr. Resto admitted to some of these violations (such as smoking marijuana) he vigorously disputed a claim that he had also attempted to bribe a lab technician to avoid a urinalysis. Following a hearing, the Court revoked his supervised release on April 17, 2014, and sentenced Mr. Resto to 48 months of imprisonment. PSR ¶ 76.

On August, 4, 2017, Mr. Resto was released from prison and began a new term of supervised release. PSR ¶ 76. He moved in with Ms. Santiago and their autistic son (who is now six years old). PSR ¶ 99; Exhibit D. For approximately 14 months, he was lawfully employed at FIG Capital, performing clerical duties, maintenance work and interacting with customers. PSR ¶ 123. Between December, 2018 and the time of his arrest on the current charges, he worked as the general manager at a restaurant. PSR ¶ 124. Meanwhile, Mr. Resto was a dutiful father. PSR ¶ 97. He gave his "full, undivided attention" to his autistic son, taking him to the park, teaching him how to ride a bicycle, bringing him to pre-school programs every day, and volunteering to coach his teams. According to Ms. Santiago, Mr. Resto was determined to "make up all of the lost time he had away from his family." He also similarly assumed the role of step-father to Ms. Santiago's other children. Exhibit B (letter from Taisha Santiago). And he strengthened his relationship with an older son from a prior relationship, advising him how to succeed in business. Exhibit B (letter from Raymond Resto III).

<u>The offense conduct</u>

Although the charged conspiracy spanned 2015 through 2019, Mr. Resto's involvement did not begin until sometime in late 2018. One individual approached Mr. Resto, asking him if he could locate a supplier. Mr. Resto in turn contacted Joel Lopez, a known drug dealer. Thereafter, Mr. Resto acted a "middle-man" brokering transactions between various people, often involving multiple kilograms of cocaine and heroin. According to the PSR, Mr. Resto is accountable for distributing six kilograms of heroin and ten kilograms of cocaine. PSR ¶ 49.

<u>The arrest and subsequent events</u>

Mr. Resto and eight others were arrested in February, 2019 on charges of violating 21 U.S.C. § 841 (b)(1)(A). PSR § 38. On January 26, 2021, he pleaded guilty to the lesser included offense

of violating 21 U.S.C. § 841(b)(1)(C). The parties stipulated that the base offense level was 32, on the ground that the offense involved 6 kilograms of heroin and 10 kilograms of cocaine (a converted drug weight of 3,000-10,000 kilograms) and that, after applying a 3-level reduction for acceptance of responsibility, the adjusted offense level was 29. Further, the parties agreed that Mr. Resto was in Criminal History Category IV, resulting in a guideline range of 121 to 151 months of imprisonment. The Probation Department agrees with the calculation and recommends a sentence of 121 months of imprisonment.

While incarcerated at the Metropolitan Detention Center in Brooklyn, Mr. Resto's now-fiancee gave birth to their second child (who is now about two years old). Moreover, his entire family has remained very supportive, as indicated in the annexed letters. He communicates with his family frequently, despite that restrictions arising out of COVID-19 have made social visits very difficult. PSR ¶¶ 91, 97, 98. Somehow, he has managed to bond with his younger son, though born during Mr. Resto's incarceration. According to his family, he has become committed to improve his life and strengthen his relationships with his children whenever he is released. Exhibit B (letter from Taisha Santiago). Still, he is consumed with guilt over the knowledge that his absence has burdened his fiancé with additional child-care responsibilities. And he is particularly sensitive to the fact that one of his children is autistic and beset by developmental issues. PSR ¶¶ 99-101; Exhibits A, B and Exhibit D.

Aside from the restrictions on social visits, the ongoing pandemic impacted Mr. Resto negatively in a number of other ways. For extended periods, inmates were in a virtual "lock-down" state and they were permitted out of their cells for just 30 minutes a day. They were often served moldy, cold food. Medical care was generally deficient. Mr. Resto personally witnessed one inmate,

Edwin Segarra, pass away. PSR ¶ 107. And in November, 2020, he himself became infected with COVID-19. In the ensuing months, he suffered from a variety of symptoms, including respiratory issues, fatigue, fever, sore throats, loss of smell and taste, and headaches. Until counsel was able to enlist the intervention of this Court, the MDC failed to provide any treatment whatsoever. To this day, Mr. Resto continues to suffer some long-term symptoms, such as extreme fatigue and constant coughing. PSR ¶ 106; Exhibit A.

Still, Mr. Resto has endeavored to be a model inmate. He has incurred no disciplinary violations while at the MDC and completed numerous classes and programs, such as: "structured activity" (1/30/20); "sentry journal eat smart course" (7/17/20); "effective communication" (10/20/20); "Sentry My Personal Health Journal" (11/9/20); "parenting modified class" (2/12/21); "finance modified class" (4/2/21); "sentry weight management course" (4/16/21);"structured activity" (4/29/21); "sentry weight management course" (5/21/21): "sentry recreation and leisure course" (8/14/21); and "sentry personal health journal course" (10/16/21 and 10/31/21). Exhibit C.

. Regarding his work at the jail as a cleaner, food server and doing laundry, Mr. Resto has earned a glowing work report that grades his performance as "outstanding" in all categories. His counselor summarizes that: Mr. Resto "gives input on how to do things better, safer and more efficient"; "ensures that inmates are following the CDC guidelines and institutional guidelines"; "drives himself exceptionally well"; "is a true leader who performs his duties well and is always willing to take on additional duties"; "works well with staff and other inmates"; "is always willing to take on additional tasks as needed"; "is one of the more reliable inmate workers";"is always willing to train other inmates"; and "is an example of what true leadership is all about." Exhibit C.

Although his release date is obviously uncertain, Mr. Resto has given considerable thought to the future. He plans to move back in with Taisha Santiago and their children and resume being an active, caring father. He intends to find the best, most stable employment available, and expects to have many opportunities in light of his varied experience and skills. Above all, he is determined not to repeat his past mistakes.

## POINT I

### THE DEFENDANT SHOULD BE SENTENCED TO A SENTENCE SIGNIFICANTLY BELOW THE GUIDELINE RANGE

The very first sentence of § 3553(a) declares that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." § 3553 then directs the sentencing court to consider "the nature and circumstances of the offense and the history of the defendant," as well as the need for the sentence:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Among other factors that must be considered are "the kinds of sentences available," such as community service or home detention, (subsection 3), the sentencing guidelines (subsection 4), and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar crimes (subsection 6). *See generally, United States v Salinas,* 365 F.3d 582, 589 (7th Cir. 2004). In this case, we submit that due consideration of all of these factors warrants the imposition of a sentence substantially below the guideline range.

To begin with, the stipulated guideline range – though technically correct – overstates the seriousness of Mr. Resto's criminal history for two distinct reasons. First, his two prior convictions – though technically separate for criminal history purposes – were plainly intertwined with each other. His prior convictions were for a drug conspiracy (sentence imposed in February, 2000) and a use of a firearm during a crime of violence (sentence imposed in August, 2001). The latter offense was charged while Mr. Resto was already in custody on the former offense. But while he was arrested and sentenced on different dates for the two crimes, it seems clear that the crimes were closely related. According to the PSR for that case, Mr. Resto was part of a drug trafficking organization from 1994-1998. And "as part of his involvement" he participated in kidnapping a cocaine supplier who had sold his organization fake cocaine. During that incident, a co-defendant shot the victim. PSR ¶ 74. Thus, the PSR for the firearms offense did <u>not</u> assess criminal history points for the drug conspiracy since the latter offense was deemed to be part of the former offense.

Based upon this factual recitation, it is unclear why the weapons charge was not included in the same accusatory instrument as the narcotics conspiracy charge. Perhaps the government did not learn of the underlying events for both crimes in the same time period. In any event, it is fair to say that customarily such charges, if fully known and investigated, would ordinarily be brought against a defendant simultaneously. And in that situation, a conviction on the charges would result in three criminal history points. But here, for whatever reason, the two charges were brought separately, thereby resulting in six criminal history points. Thus, it seems pure happenstance that Mr. Resto's Criminal History Category is IV rather than III.

A separate problem with the Criminal History determination is that the 18 U.S.C. § 924(c) conviction is likely invalid after *United States v. Davis,* 139 S. Ct. 2319 (2019) and its progeny.

According to the PSR for that crime, Mr. Resto was charged with violating 18 U.S.C. § 924(c) on the theory that he used a firearm during a crime of violence, specifically, a conspiracy to kidnap and kidnapping. Since *Davis,* courts have indicated that kidnapping does not qualify as a predicate crime of violence. *See e.g., United States v Minaya,* 841 Fed. Appx. 301, 304 (2nd Cir. 2021); *Knight v United States,* 936 F.3d 495, 498 (6th Cir. 2019)' *United States v Brazier,* 933 F.3d 796, 800-01 (7th Cir. 2019).

Accordingly, this Court should place little weight on the stipulated guideline range. Alternatively, this Court would be justified in treating Mr. Resto as if he were under Criminal History Category III, rather than Criminal History Category IV. Notably, if Mr. Resto was in Criminal History Category III, his applicable guideline range would be 108-135 months of incarceration (rather than 121-151 months).

With regard to the other statutory sentence factors, we acknowledge, of course, the seriousness of the offense conduct. Essentially, Mr. Resto acted as a "broker" or "middle-man," helping to arrange transactions of wholesale quantities of drugs. Specifically, the government estimates that he is accountable for 6 kilograms of heroin and 10 kilograms of cocaine, thereby making him one of the more culpable members of the charged conspiracy. Mr. Resto, who has his own history of substance abuse struggles, is fully aware that such conduct posed a real danger to his community.

Still, it is also important not to overstate his conduct. Unlike most of his co-defendants (including Sal Castro), Mr. Resto did not participate in distributing fentanyl, a drug which the government has emphasized in other sentencings warrants particularly harsh sentences for its unusually destructive and addictive nature. Further, unlike a few other conspirators, Mr. Resto did

not act as a leader, manager, or supervisor, so as to justify any role adjustment. In addition, his conduct apparently was shorter-lived than others, ranging from late-2018 until about February, 2019, whereas the charged conspiracy lasted from 2015-2019. In fact, Mr. Resto's recollection is that his involvement in the conspiracy lasted no more than two to three months. For these reasons, his conduct – though admittedly serious – arguably is not as significant as a number of other of his co-conspirators.

The genesis of Mr. Resto's criminal conduct also should be taken into account. As a child, Mr. Resto was raised in difficult circumstances. His father was never present and failed to offer any financial or emotional support to the family. When Mr. Resto was eleven years old, his father was murdered, depriving him of a hope that the family would ever be reunited. Exhibit A. His mother worked two jobs but still was occasionally unable to pay the rent, buy enough clothing, or provide sufficient food. Because his mother was so busy working, he was cared for primarily by his grandmother. Despite the family's best efforts, Mr. Resto could not be shielded from the bad influences in the neighborhood, which was "plagued with drugs, violence, prostitution, and gambling." PSR ¶ 94. For a brief period, it appeared that he might benefit from an athletic scholarship he received when he was 13 years old to attend a private school. But his anxiety and self-consciousness about being poor prevented him from assimilating well. So he coped by smoking marijuana and drinking alcohol daily. Before he was 16 years old, he had serious substance abuse issues that would continue for decades. In order to support his habits, he dropped out of high school and began selling drugs.

Simply put, Mr. Resto's initial crimes can be directly attritbuted to a difficult economic background, exposure to drugs and violence when growing up, absence of paternal guidance and

support, and significant substance abuse. But for these conditions, it is quite likely that his life would have followed an entirely different path. Instead, he developed habits that could most easily be supported by selling drugs. And once down that path, he found it difficult to escape from a cycle of destructive conduct. Convictions followed and, by the time he reached his mid-20s, he was facing sentences for two crimes, collectively amounting to approximately 15 years of incarceration.

Nevertheless, even while selling drugs, Mr. Resto exhibited certain positive qualities. He worked in construction. He fathered and supported two children. PSR ¶¶ 102, 122. He also used some of the proceeds of his drug dealing for good purposes. Among other things, he sponsored various youth sports leagues, coached teams, and gained a reputation as a generous, kind person who genuinely cared about children and "performed commendable community service." PSR ¶ 96. Exhibit B (letters from Cesar Rosa, Desiree Vasquez and Brandee Cruz). Ironically, Mr. Resto's efforts to support his family and sponsor events in his community may also have became rationalizations for continuing to sell drugs. Still, these were sincere efforts and reflective of a genuine desire to make a positive contribution.

Mr. Resto also made some progress during his lengthy incarceration. He earned a GED, completed a multitude of courses and programs, and developed skills as a personal trainer. PSR ¶¶ 72, 121; Exhibit A. After his final release from prison in August, 2017, (following a term for violating his supervised release),Mr. Resto exhibited a more mature attitude in several concrete way. He moved in with Ms. Santiago and their autistic son (who is now six years old). PSR ¶ 99. For approximately 14 months, he was lawfully employed at FIG Capital, performing clerical duties, maintenance work and interacting with customers. PSR ¶ 123. Between December, 2018 and the time of his arrest on the current charges, he worked as the general manager at a restaurant. PSR ¶

124. Meanwhile, Mr. Resto was a dutiful father. PSR ¶ 97. He gave his "full, undivided attention" to his autistic son, taking him to the park, teaching him how to ride a bicycle, bringing him to pre-school programs every day, and volunteering to coach his teams. According to Ms. Santiago, Mr. Resto was determined to "make up all of the lost time he had away from his family." He also similarly assumed the role of step-father to Ms. Santiago's other children. Exhibit B (letter from Taisha Santiago). And he strengthened his relationship with an older son from a prior relationship, advising him how to succeed in business. Exhibit B (letter from Raymond Resto III).

Thus, a balanced summary of Mr. Resto's overall conduct as an adult is that he has engaged in both positive and negative behavior. While he has obviously committed serious crimes and spent years in prison, he has increasingly accepted new responsibilites, taken advantage of available educational and training opportunities, and shown the ability to find and maintain lawful employment. Notwithstanding his current case, there are persistent, positive trends.

Further, these trends have become more pronounced since his arrest on the current case. He has completed numerous classes and programs throughout his time at the MDC, including "structured activity" (1/30/20); "sentry journal eat smart course" (7/17/20); "effective communication" (10/20/20); "Sentry My Personal Health Journal" (11/9/20); "parenting modified class" (2/12/21); "finance modified class" (4/2/21); "sentry weight management course" (4/16/21);"structured activity" (4/29/21); "sentry weight management course" (5/21/21): "sentry recreation and leisure course" (8/14/21); and "sentry personal health journal course" (10/16/21 and 10/31/21). He has received stellar reviews of his work performance, with "outstanding" grades in all categories. His counselor summarizes that: Mr. Resto "gives input on how to do things better, safer and more efficient"; "ensures that inmates are following the CDC guidelines and institutional

guidelines"; "drives himself exceptionally well"; "is a true leader who performs his duties well and is always willing to take on additional duties"; "works well with staff and other inmates"; "is always willing to take on additional tasks as needed"; "is one of the more reliable inmate workers";"is always willing to train other inmates"; and "is an example of what true leadership is all about." Exhibit C.   And he has incurred no disciplinary sanctions at all.

Moreover, this exemplary conduct is especially notable in view of the harsh conditions of the pandemic. Courts have long recognized that unusually difficult conditions of confinement may warrant reductions in sentence. *See generally, United States v Carty,* 264 F.3d 191, 196-97 (2nd Cir. 2001); *see e.g., United States v Salvador,* 2006 WL 2034637m at *4 (S.D.N.Y. 2006).   More relevant, many courts have found that the harsh circumstances arising out of the pandemic are a basis for leniency.  *See, United States v Romero,* 2021 WL 1518622, *4  (S.D.N.Y. 4/16/21) ("[a] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison");  *See, United States v Stubbs,* 2021 WL 185415 (S.D.N.Y. 1/19/21) ("[g]iven the unexpectedly harsh sentences prisoners have been serving during the pandemic, perhaps the political branches ought to consider a '2 for 1' days harsh time credit ***"); *see also, United States v Beltran,* 2021 WL 1249217, *6 (S.D.N.Y. 4/5/21) ("The Court has also repeatedly, at sentencing and in resolving companionate release motions, treated each day of imprisonment spent in the harsh conditions caused by COVID-19 as equivalent to more than a day's imprisonment during ordinary times"); *United States v Gonzalez,* 18 Cr. 669 (JPO) (4/2/21 S.D.N.Y) (treating 24 months during the pandemic as the equivalent to three years) .

Similarly, this Court is entitled to consider the fact that Mr. Resto, like all federal inmates, has endured – and may continue to endure for some time – particularly harsh conditions of

confinement during the pandemic. There have been severe curtailments on his social visits, and even social calls. For extended periods, inmates were in a virtual "lock-down" state and they were permitted out of their cells for just 30 minutes a day. They were often served moldy, cold food. Medical care was generally deficient. Mr. Resto personally witnessed one inmate, Edwin Segarra, pass away. PSR ¶ 107; Exhibit A. And in November, 2020, he himself became infected with COVID-19. In the ensuing months, he suffered from a variety of symptoms, including respiratory issues, fatigue, fever, sore throats, loss of smell and taste, and headaches. Until counsel was able to enlist the intervention of this Court, the MDC failed to provide any treatment whatsoever. To this day, Mr. Resto continues to suffer some long-term symptoms, such as extreme fatigue and constant coughing. PSR ¶ 106; Exhibit A. Thus, this Court would be justified in devising a sentence that effectively credited Mr. Resto with additional time served to account for the unusually harsh conditions he has endured due to the pandemic and corresponding prison conditions.

Another significant factor for this Court's consideration is the exceptional family support Mr. Resto currently enjoys. As revealed in the various letters of support, as well as the PSR, he remains a vital member of the family. They universally characterize him as a devoted father to his young children, adult children, and step-children. Though they are painfully aware of his mistakes, he has retained their respect, admiration and love. They recognize that he is more committed than ever to changing his life permanently. And they believe that he has the intelligence, experience, and drive to do so. Whenever he is released, Mr. Resto intends to move back in with Taisha Santiago and their children, offer the type of support he never received from his own father, and pursue meaningful employment. Exhibit B. Based upon his experience working in construction, at a restaurant and at an office, as well as his skill as a personal trainer, Mr. Resto is confident he will have many job

opportunities. And wherever he works, he knows that his family and friends will be a pillar of support. Such support is good cause for this Court to be optimistic that Mr. Resto will succeed and never commit another crime.

For all these reasons, we believe that a sentence substantially below the guideline range would be more than sufficient to comply with the statutory sentence purposes set forth in 18 U.S.C. § 3553.

Dated: New York, NY
February 2, 2022

/s/
James E. Neuman, P.C.
Attorney for Defendant Raymond Resto
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 966-5612